FILED

2008 May-14  AM 10:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| CALEBE HERRING, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | 2:06-cv-1955-JHH |
| CON-WAY FREIGHT, INC., | ) | |
| DEFENDANT. | ) | |

## MEMORANDUM OF DECISION

The court has before it the February 18, 2008 motion (doc. # 17) of defendant Con-Way Freight, Inc. for summary judgment. Pursuant to the court's February 19, 2008 order, the motion was deemed submitted, without oral argument, on March 18, 2008. For the following reasons, Con-Way's motion for summary judgment is due to be granted in full.

## I. Procedural History

Plaintiff Calebe Herring commenced this action on September 28, 2007 by filing a complaint in this court alleging violations of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Fourteenth Amendment to the United States Constitution. More specifically, plaintiff

contends that defendant's alleged conduct constitutes (1) discrimination on the basis of race; (2) hostile work environment racial harassment; and (3) retaliation. (See Compl. ¶¶ 24-48.)  Defendant's January 2, 2008 answer (doc. #5) included a partial motion to dismiss the alleged violation of the Fourteenth Amendment for failure to state a claim upon which relief could be granted.  Upon agreement of the plaintiff (doc. #7), the court dismissed the alleged violation of the Fourteenth Amendment.  (See doc. #8.)  Defendant's February 18, 2008 motion for summary judgment asserts that there are no genuine issues of material fact and that defendant is entitled to judgment as a matter of law as to all plaintiff's remaining claims.

Both parties have filed briefs and submitted evidence in support of their respective positions.  Defendant submitted a brief and evidence[1] (doc. # 18) in support of its own motion for summary judgment on February 18, 2008.  On March 11, 2008, plaintiff filed a brief and evidence[2] (doc. # 20) in opposition to

---

[1] The defendant submitted the following evidence: deposition of Calebe Herring, with exhibits; deposition of Jeff Kerbo, with exhibits; deposition of Tim Grant, with exhibits; deposition of Dana Boles, with exhibits; deposition of John Bowen, with exhibits; deposition of Ryan Beagle, with exhibits; deposition of Jeremy Willingham, with exhibits; and declaration of Jeff Kerbo.

[2] The plaintiff submitted the following evidence: declaration of Calebe Herring; declaration of Eric Outsey; declaration of Rapheal Moore; declaration of Darryl Booker; declaration of Al Bonham.

defendant's motion for summary judgment.[3]  On March 18, 2008, defendant filed a brief (doc. # 23) in reply to plaintiff's opposition.

In addition to its reply brief, defendant filed a motion to strike portions of the evidence filed by plaintiff in opposition to summary judgment.  On April 11, 2008, the court granted in part and denied in part (doc # 27) that motion.  The court has considered the remaining evidence on summary judgment.[4]

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and

---

[3]  The next day, on March 12, 2008, plaintiff filed a corrected version of his brief and evidence.  (Docs. # 21-22.)  Although filed out of time and without leave of court, the court has considered these corrected versions in making its decision.

[4]  As to all the evidence submitted, the materiality, relevancy, and potential admissibility of evidence at trial was carefully weighed by the court during the summary judgment process. Immaterial evidence, irrelevant evidence, and other evidence that could not be reduced to admissible form at trial, see Macuba v. Deboer, 193 F.3d 1316, 1322-23 (11th Cir. 1999), was rejected by the court when making its final decision on defendant's summary judgment motion.

identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See Celotex Corp., 477 U.S. at 323.  After the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Prop., 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on

4

summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. See Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to

5

support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the

movant meets its initial burden by using this second method, the non-moving party

may either point out to the court record evidence, overlooked or ignored by the

movant, sufficient to withstand a directed verdict, or the non-moving party may

come forward with additional evidence sufficient to withstand a directed verdict

motion at trial based on the alleged evidentiary deficiency.  However, when

responding, the non-movant can no longer rest on mere allegations, but must set

forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996)

(citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[5]

Calebe Herring, an African American, began his employment with Con-

Way on or about January 12, 2004,[6] as a Business Development Manager Trainee.

(Herring Dep. at 58; Kerbo Dep. at 16-19.)  As a trainee, Herring worked through

Con-Way's Business Development Center, located in Texas.  (Herring Dep. at 58-

---

[5] These are the facts for summary judgment purposes only.  They may not be the actual facts.  See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts'") (citation omitted).  Where the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See Fitzpatrick, 2 F.3d at 1115.

[6] Although Herring's brief asserts that he began his employment with Con-Way "on or about December 17, 2003," the evidence cited by Herring does not support this proposition.

6

64; Kerbo Dep. at 16-19; Grant Dep. at 128-29.)  On January 30, 2005, Herring was promoted to a Freight Operations Supervisor (FOS or supervisor) position in the Birmingham Service Center.  (Herring Dep. at 59; Grant Dep. at 19, 128-29.)

As an FOS, Herring worked in the Freight Assembly Center, which was a nighttime operation.  (Herring Dep. at 61, 66.)  Three FOSs and a "quarterback" were assigned to the Freight Assembly Center.  (Grant Dep. at 21, 27-30.)  The "quarterback" was an FOS who worked with the other FOSs at the Freight Assembly Center to determine their needs for personnel and staffing.  (Grant Dep. at 28-32; Boles Dep. at 15; Bowen Dep. at 108-10.)   The "quarterback" would oversee the arrival and departure of drivers.  (Id.)  Each FOS was assigned a section of the dock, referred to as a sector, and was primarily responsible for insuring the timely unloading and reloading of freight onto the trucks within the assigned sector.  (Id. at 27-28, 128-29.)   The Freight Assembly Center is divided into three equal[7] sectors, with each FOS responsible for one-third of the dock.  (Id. at 22-23.)

---

[7] The sectors are physically the same size.  It is disputed whether the responsibility of each sector was equal.

While Herring worked at the Freight Assembly Center, there were several other FOSs that worked with him,[8] including Ryan Beagle (white), Paul Boner (white), Tim Browning (white), Ken Gordon (African American), Judge Sirmons (white), and Jeremy Willingham (white).  (Herring Dep. at 66-76; Grant Dep. at 21; Boles Dep. at 13-14.)   Browning usually served as the "quarterback."  (Boles Dep. at 15.)  All the FOSs reported to the Freight Operations Manager, John Bowen (white), the second highest management official at the Birmingham Service Center.  (Herring Dep. at 59-60.)   The highest management official at the Birmingham Service Center was the Service Center Manager.  (Id. at 60.)  Dana Boles (white) was the Service Center Manager for the majority of Herring's employment at the Freight Assembly Center, but in late February 2006, Tim Grant (white) replaced Boles in this position.  (Id. at 60-61; Grant Dep. at 53-54.)

### A.  Performance Problems

It is undisputed that Herring had performance problems before his termination.  (See generally Herring Dep. at 290-310.)  These problems were

---

[8] There were other FOSs who worked for Con-Way during Herring's employment, but they did not work at the Freight Assembly Center.  Depending on the needs of the operation, the FOSs worked in the following capacities: (1) dispatch; (2) daytime re-ship; (3) inbound; (4) outbound; and (5) Freight Assembly Center.  (Grant Dep. at 20-21; Beagle Dep. at 14.)

evidenced in eighteen Letters of Instruction (LOI) or Incident Reports[9] during the first thirteen months as an FOS, including being placed on probation twice.  (Id. at 169, 290-310, 326-37, 343-64; Exs. 12-20, 22-28, 30-31 to Herring Dep.)  For example, from February 2005 until August 2005, Herring had four LOIs for failure to follow specific instructions, four LOIs for failure to follow company procedure, and one LOI for failure to report to work on time.  (See Ex. 47 to Kerbo Dep.)  Then, from September 2005 until January 2006, Herring received six LOIS for failure to follow procedures.  (See Ex. 29 to Herring Dep.)

## B.  Alleged Harassment

Herring testified that he began feeling as if he was being harassed on the basis of his race approximately one month after he began working at the Freight Assembly Center.[10]  (Herring Dep. at 129-30.)  He stated that the majority of this alleged harassment was instigated by his direct supervisor, John Bowen.  (Id. at 133.)  When asked how the harassment and discrimination first began, Herring testified that:

---

[9] LOIs and Incident Reports are counseling or discipline documents used to report to employees files infractions of company policy or procedures.  (Kerbo Dep. at 39-40; see Ex. 47 to Kerbo Dep.)

[10] The assertion in plaintiff's brief that the harassment began as soon as Herring was transferred to Birmingham is not supported by the evidence.  In addition, the statement in Herring's undated declaration as to this point contradicts his deposition testimony and is not considered by the court.

> It was a series of events . . . just the underlying culture.  It just was
> my sector was shutting down late.  I am not getting the help that I
> need, even when I asked.  My boss was blowing up, erupting on me,
> being very unprofessional.  It was done to the guy before me[11] who
> had the same job and the guy before him who had the same job.

(Id. at 130-31.)  In addition, Herring felt as if he was "being treated differently"

because he "was the only one being constantly threatened [with losing his job[12]],

constantly being belittled in front of my peers and subordinates."  (Id. at 133.)

Herring felt like he was "kinda being pushed out . . . being taunted, like you want

me to – like to the point where I was to lose control of my emotions and erupt in

the same manner."  (Id.)

For instance, Herring recalled an incident when Bowen would "belittle

[Herring] over the radio for everyone to hear . . . this time using profanity."  (Id. at

256.)  On another occasion, Herring stated that Bowen simulated anal sex in front

of Herring and other employees, which in Herring's mind, crudely suggested that

Herring's drivers were "giving [him] the shaft."  (Id. at 247-48.)    In addition,

Herring testified that Bowen called Herring away from his work and made him

pick up trash around the terminal.[13]  (Id. at 242.)  Herring believed that Bowen,

---

[11] This man was an African-American.  (Herring Dep. at 131.)

[12] Herring was never physically threatened.  (Herring Dep. at 134.)

[13] Herring did not know whether any other supervisor, white or black, has been asked to pick up trash.  (Herring Dep. at 242-44.)

and others, were "trying to break [his] spirit, trying to discriminate" by many of these actions.  (Id. at 142-43.)   Herring began keeping a journal of the alleged harassment and discrimination on November 2, 2005, to keep record and document occurrences which he felt were not right.  (Id. at 135-36.)

The bulk of the alleged harassment stems from the issuance of LOIs by Bowen.[14]  Herring received his first LOI from Bowen on June 7, 2005, a little over four months after he began working as an FOS.  (Id. at 291, 311-12.)  In his deposition, Herring was questioned about each of the eighteen LOIs he received before his termination.  Herring could not remember the specific incidents surrounding the vast majority of the LOIs, but testified that he did dispute some of them, even though he never noted a dispute on any LOI out of fear.[15]  (Id. at 293-312.)  When he did dispute an LOI, Herring testified that he spoke with his peer supervisors or possibly with Bowen.  (Id. at 309.)  There is no evidence in the

---

[14] At this point in the court's recitation of the fact, the court notes the extremely poor citation regarding the alleged harassment by plaintiff in his brief.  For example, page 7 of plaintiff's brief, describing the alleged harassment by Bowen in the issuance of LOIs, contains short, concise sentences, followed by enormous page citations for such facts.  In fact, each of the seven sentence on that page include the exact citation to Herring's deposition: "pp.165-69, **291-365**." (emphasis added).  Such citation is clearly not helpful to the court in determining the undisputed, material facts.  And it is not the court's job to sift through every page cited in such a long citation to determine which pages actually support plaintiff's proposition, if at all.  Moreover, many of the judges in this courthouse would not go through the enormous effort this court did in determining the facts, but instead would have sent the brief back to be rewritten with proper citation.

[15] Herring signed all the LOIs, as per company policy.

11

record that Herring ever complained to upper management that Bowen was giving

him LOIs because of his race.  Instead, he reported to Bowen, Grant, and others

that the LOIS were unfair or that he was being subjected to mistreatment.  (Id. at

180-81, 217, 372-73.)

   In general, Herring complains that Bowen issued LOIs to him on a random

basis and for "ridiculous" or "petty" reasons.  (Id. at 295-96, 302-03.)  Herring

testified that Bowen used LOIs for "petty" violations in an effort to "break [his]

spirit . . . because of [his] race" and "just to mess with [him.]"  (Id. at 302-03, 308,

310-11.)  He contends that the fact that Bowen was issuing LOIs "back-to-back-

to-back-to back . . . shows that it's trying to break my spirit by keeping me in the

office."  (Id. at 326-27.)  Herring did admit, however, that he is not perfect and

that he made mistakes on the job.  (Id. at 328.)  It is Herring's belief, however, that

Bowen was looking for as many mistakes as he could find to "break [Herring's]

spirit" and force him to quit.

   Herring also alleges that Bowen gave Herring more difficult jobs.  For

example, Bowen assigned Herring to the most time-consuming sector,[16] Sector 1,

which was usually the last sector to shut down at the end of the shift every day.

---

[16] Defendant disputes that Sector 1 was any more time-consuming than the other sectors.
For the purposes of summary judgment, the court assumes that it was the most time-consuming,
per Herring's testimony.

12

(Id. at 105.)  Because it was the last to shut down, a lot of nights Herring was the last supervisor to leave, while the other supervisors went home to be with their families.  (Id. at 160-61.) In addition, a lot of days, Herring testified that he did not get to eat lunch because of the amount of work he was required to do.  (Id. at 238, 270.)

Herring was supervisor of Sector 1 for about a year,[17] and admitted that while he was supervisor of Sector 1, it did not shut down on time on many nights. (Id. at 105.)  Herring testified that Sector 1 handled "the majority of the workload" and work was not equally divided between sectors.  (Id. at 107.)  Herring testified that when he asked Bowen if there was anything that could be done about the length of his shift as compared with other supervisors on the easier sectors, Bowen told Herring to "suck it up" and "make the best of it" because "[t]his is what it is, and this is what it will have to be."  (Id. at 150-51.)  After Herring was reassigned to Sector 2, a white male, Jeremy Willingham, was assigned to Sector 1.  (Id. at 149.)  Herring testified that Willingham "received more help as far as more

---

[17] Herring was not working in Sector 1 when he was terminated, but instead working in Sector 2, which he testified rarely shut down late and was easier in comparison to Sector 1. (Herring Dep. at 107, 161.)

13

labor"[18] and the length of his shift was shortened in that Willingham's start time was moved an hour later than the other supervisors.  (Id. at 150.)

Bowen also allegedly gave Herring more demeaning jobs than he gave white supervisors.[19]  Herring testified that while he was the supervisor of Sector 1, Bowen assigned Herring to conduct a daily yard check.  This task required Herring to "walk through the terminal verifying every trailer, the actual physical inventory of each trailer and match it to the computer."  (Id. at 162.)  The check "was a tedious task" which "kept [Herring] there about an hour and a half longer than [his] peers."  (Id.)  Herring testified that he was initially given this job because he was the "newest supervisor" and had to "pay [his] dues."  (Id. at 162, 163-66.)  However, when another supervisor was hired, a white male, he was not given the yard check duty and Herring continued to perform this task.  (Id. at 148, 163.)  When Herring asked why the new supervisor did not have to perform this duty, he was told that the policy changed and that the Sector 1 supervisor was now

---

[18] Herring testified that Willingham actually took a forklift operator from Sector 2, Herring's sector, to help Willingham on a nightly basis, thus putting Herring at a disadvantage and causing Herring to shut down Sector 2 late on some nights where he otherwise could have shut down on time.  (Herring Dep. at 153-55.)

[19] Herring testified that Bowen gave other African American employees demeaning tasks as well.  For instance, on one occasion Bowen instructed an African American employee to stop work and go out in the rain to change propane tanks, even though there were other white employees who were not working, just standing around on the floor, who could have done the job.  (Herring Dep. at 255-59.)

14

responsible for the check.  (Id.)  This change was confirmed when Herring moved

to Sector 2; at that point, Herring no longer had to perform the trailer check, and

the supervisor who ran Sector 1 began performing that duty.  (Id. at 168.)

Additionally, Herring testified that Bowen forged Herring's name on the

manifest.[20]   (Id. at 251.) For instance, when Bowen would help Herring close

down Herring's trailers, instead of signing his own name at the bottom of the

manifest, Bowen would sign Herring's name, indicating that Herring shut the

door.  (Id. at 252.)  Although Herring testified that he never actually saw Bowen

sign his name, Herring did see documents with his signature that were not in his

handwriting.  (Id. at 233-34, 253.)

Herring also testified that Bowen refused to support Herring when he was

having problems with a white female employee who worked under Herring, Erica

Thompson.  (Id. at 264-65.)  Herring went to Bowen with his concerns that

Thompson was not following his instructions, but Bowen would not move her and

give Herring another employee.  (Id.)  Thompson was later moved from Herring's

supervision, but not because of Herring's request.  (Id.)

---

[20] The supervisor who signs the manifest is ultimately responsible if proper procedures
are not followed.

Herring was never personally subjected to any racial slurs, (id. at 249-51), although he testified about two incidents of racially derogatory comments. The first was an incident when fellow FOS Ryan Beagle (white) commented that Grant should stop hiring drivers from north Birmingham because they were running from the police into a job with Con-Way. (Id. at 245-46.) Herring believed that Beagle made the comment because all of the new drivers were African American. (Id. at 246.) Although Herring laughed and the joke and did not report it to management, Herring considered it racially derogatory. (Id. at 249.)

The second incident involved a white driver using the word "nigger" during a conversation with another driver. (Id. at 249-51.) Herring did not personally hear the comment, but another truck driver told Herring about the incident. (Id.) The comment was reported to Human Resources, and, after an investigation, the driver was disciplined. (Kerbo Dep. at 72-77.) According to Herring, after the driver was punished, Herring overheard Bowen state that he believed that the punishment was too harsh. (Herring Dep. at 253-54.) Herring testified that Bowen's comment was another "illustrat[ion] of the racial tension . . . upper management insensitivity or acceptance of these types of situations." (Id. at 253.)

C. Con-Way's Employment Policies

Under Con-way's anti-harassment policy, an employee who has a

16

question, problem or complaint about discrimination is required to immediately notify the Human Resources Director or the EEO Coordinators. (Herring Dep. at 187; Ex. 5 to Herring Dep.; Kerbo Dep. at 20-24.)  If any employee feels uncomfortable bringing their concerns to those individuals, the employee may communicate directly with Con-Way's President.  (Id.)

Con-way also has an Open Door Policy, assuring that employees have an opportunity to discuss work-related issues with management. (Herring Dep. at 188; Ex. 6 to Herring Dep.; Kerbo Dep. at 24-27; Ex. 29 to Kerbo Dep.). Con-way's policy encourages employees to make complaints first to their immediate supervisor.  If the employee feels uncomfortable doing so, the policy states that the employee should next go to the Service Center Manager or Senior Location Manager, and then the Region Manager or Vice President, and finally to the Human Resources Director or Con-Way's President.  (Id.)  However, if the nature of the complaint lends itself to discussion with someone out of sequence, the employee can utilize the Open Door Policy and speak to anyone in this list of possibilities. (Id.)

Con-way also has an Employee Conduct Policy, which provides consistent and reasonable standards of employee conduct and fair and orderly guidelines in

17

those cases when employee disciplinary action becomes necessary. (Herring Dep. at 188-89; Ex. 7 to Herring Dep. Dep.)  The Employee Conduct Policy instructs employees, who believe that corrective action has been administered arbitrarily, to utilize the Open Door Policy to request review of the circumstances surrounding the disciplinary action. (Id.)

At the beginning of his employment with Con-way, Herring received management harassment training, as well as Con-way's Equal Employment Opportunity Policy, No Harassment In Employment Policy and Open Door Policy. (Herring Dep. at 186-93, 195; Exs. 4-6, 9-10 to Herring Dep.; Kerbo Dep. at 20-27; Grant Dep. at 128-29).  Herring signed an acknowledgment of his receipt of the training and policies.  (Id.)

## D.  Termination

On April 24, 2006, Grant received three Loading Error Reports.  (Kerbo Dep. at 36-40; Ex. 33 to Kerbo Dep.)  The reports showed loads with extensive damage that were all from Herring's sector.  (Id.)  These reports indicated that Herring was responsible for inspecting the loads for proper blocking and bracing. (Id.)

On the following day, April 25, 2006, the Freight Assembly Center did not close on time, according to the established time closure standards.[21]  Herring contends that he was operating without his data entry clerk and that his sector did not have enough drivers to handle the volume of shipments.  (Herring Dep. at 79-81.)  Herring testified that he requested more drivers, but did not receive any help.  (Id.)  Grant received a phone call at his home from Browning, the "quarterback", who reported that Herring was struggling to close his sector on time and suggested that Grant come to the Freight Assembly Center to address the situation.  (Grant Dep. at 28-32, 95.)  Grant came to the Freight Assembly Center and assisted in shutting down Herring's sector.  (Id. at 95-96.)  Even with Grant's assistance, however, the failure to shut down Herring's sector on time resulted in numerous delayed customer shipments.  (Id. at 128-29; Ex. 5 to Grant Dep.)

Herring testified that he met with Grant after the shift and explained the circumstances surrounding the failure of his sector to close down on time.  (Herring Dep. at 79-80.)  Herring testified that the mood of this meeting was

---

[21] The goal is for all sectors to be shut down by 3:15 a.m.  (Grant Dep. at 95-96.)  This goal is important because freight must be transferred from the Freight Assembly Center to various destinations within a designated time frame in order to ensure proper customer delivery.  (Id. at 128-29.)

confrontational and that Herring felt like Grant was trying to make Herring lose his temper and resign.  (Id. at 88-89.)

The next day, Grant placed Herring out-of-service[22] because of his poor performance.  (Grant Dep. at 108-11, 128-29; Ex. 5 to Grant Dep.)   When an employee is placed out-of-service, a message is sent to the Regional Manager, Vice President of Operations, Human Resources Director, and the company's President.  (Kerbo Dep. at 29-30.)  At that point, the Human Resources Director, Jeff Kerbo, reviews the message, looks to see what prompted the termination request and decides if further investigation is needed.[23]  (Id.)  Kerbo then reviews the employee's personnel file, including all corrective actions and speaks with the Service Center Manager and the Regional Manager[24] regarding the circumstances of the termination recommendation.  (Id. at 38-41.)  After receipt of all the necessary information, Kerbo then forwards the information to the company President and presents the request to terminate the employee.  (Id. at 30, 38-40.)

---

[22] Being placed out-of-service is a recommendation for termination.  (See Kerbo Dep. at 30, 32.)

[23] For example, Kerbo may need to get witness statements if they were not obtained before the out-of-service message was sent.  (Kerbo Dep. at 30.)

[24] Kerbo normally speaks to the Regional Manager because he is the direct report of the Service Center Manager and, in most cases, the Regional Manager is aware of the circumstances. (Kerbo Dep. at 40.)  Kerbo inquires whether the Regional Manager also recommends termination of the employee.  (Id.)

The President usually discussed the situation with Kerbo before approving or rejecting the recommendation to terminate.  (Id. at 30-31, 38.)  The President is the only person with the authority to terminate a full-time employee.  (Id. at 30-31.)

Although the record is unclear whether the above process was followed in Herring's case,[25] Herring was terminated from his employment with Con-Way on April 26, 2006.  (Herring Dep. at 77.)  At the time of his termination, Herring did not inform Grant that he disputed his termination.  (Id. at 383.)  Grant told Herring that he could appeal the termination decision to Con-Way's Employee Termination Review Board.[26]  (Id. at 126.)  Herring did not appeal the termination decision.  (Id. at 127.)

## IV. Analysis

Herring claims that Con-Way discriminated against him on the basis of his race when it (1) subjected him to a racial harassment, which constituted a hostile work environment, in violation of Title VII; (2) discriminated against in his

---

[25] There is no evidence in the record that the process was not followed in Herring's case.

[26] According to Con-Way policy, any employee who is involuntarily terminated can appeal the termination decision.  (Kerbo Dep. at 28.)  In 2007, the Employee Termination Review Board heard more than 100 appeals of termination decisions and approximately 37% resulted in a reversal of the termination decision.  (Id. at 28-29.)

21

termination,[27] in violation of Title VII and § 1981; and (3) retaliated against him when it terminated him, in violation of Title VII and § 1981.  The court discusses each claim separately below.

### A.   Hostile Work Environment

Title VII provides that an employer "shall not discriminate against any individual with respect to his terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . ."  42 U.S.C. § 2000e-2(a)(1).  Although Title VII does not explicitly mention racial harassment, courts have recognized that harassment which changes the terms or conditions of employment constitutes a violation of the Act.   See, e.g., Meritor Savings Bank v. Vinson, 477 U.S. 57, 67 (1986); Mendoza v. Borden, Inc., 195 F.3d 1238, 1244-45 (11th Cir. 1999) (en banc).   A plaintiff may rely upon one of two theories to prove racial harassment in violation of Title VII.  "Under the first

_____

[27] In his complaint, plaintiff contends that he was discriminated against in "job assignments, discipline, discharge, and other terms and conditions of employment."  (Compl. ¶¶ 25, 27, 30.)  With the small exception of the argument that "each successive LOI should be viewed as a resulting tangible employment action"(Pl. Br. at 32), plaintiff's brief centers entirely on his termination.  For example, the heading to plaintiff's discrimination argument states, in bold "Plaintiff's Discriminatory Termination Claim" (id. at 29), and his pretext argument asserts "The Defendant's Articulated Reason for Terminating the Plaintiff is More Likely Pretext for Intentional Discrimination."  (Id. at 33.)  Not once does his argument discuss alleged discrimination in  "job assignments, discipline, . . . and other terms and conditions of employment."  As such, the court deems these allegations abandoned, see Irwin v. Hawk, 40 F.3d 347, 347, n.1 (11th Cir.1994), and summary judgment is due to be granted as to these claims.

22

theory, the plaintiff must prove that the harassment culminated in a 'tangible

employment action' against [him or] her.  Under the second or 'hostile work

environment' theory, the plaintiff must prove that [he or] she suffered 'severe or

pervasive conduct.'"[28]  Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d

1227, 1231 (11th Cir. 2006).   According to plaintiff's complaint and brief in

opposition to summary judgment, plaintiff attempts to establish racial harassment

on the basis of the second theory.

A plaintiff attempting to show that he has been subjected to a hostile work

environment by a supervisor must prove a number of elements to establish the

claim.  These elements include proof that: (1) the employee belongs to a protected

group; (2) the employee has been subject to unwelcome harassment; (3) the

_____

[28] The court is aware that in Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and
Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), the Supreme Court indicated that
courts should no longer use the "hostile work environment" label in analyzing whether an
employer should be held liable on a Title VII claim in which no tangible adverse employment
decision has been made.  See Frederick v. Sprint/United Management Co., 246 F.3d 1305, 1311
(11th Cir. 2001).  Instead, when analyzing whether an employer should be held liable for a
supervisor's harassment, courts should separate these cases into two groups: (1) harassment
which culminates in a "tangible employment action," such as discharge, demotion or undesirable
reassignment, and (2) harassment in which no adverse "tangible employment action" is taken but
which is sufficient to constructively alter an employee's working conditions.  Ellerth, 524 U.S. at
761-63; Faragher, 524 U.S. at 790, 807; see also Johnson v. Booker T. Washington Broadcasting
Serv., Inc., 234 F.3d 501, 508 (11th Cir.2000) (recognizing shift in terminology).  That being
said, however, courts, including the Eleventh Circuit, continue to use the short-hand label
"hostile work environment" when referring to this second type of case.  See Cotton v. Cracker
Barrel Old Country Store, Inc., 434 F.3d 1227, 1231 (11th Cir. 2006).  The court does the same
here.

harassment was based on the race of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment; and (5) a basis for holding the employer liable.  See Mendoza, 195 F.3d at 1245.  A prima facie showing of a hostile work environment arises only where the harassment is so "severe or pervasive" as to "alter the conditions of employment and create an abusive working environment."  Faragher, 524 U.S. at 786 (citing Meritor Sav. Bank, 477 U.S. at 67).  The courts' interpretations of the general standard announced in Meritor "are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'"  Faragher, 524 U.S. at 788 (citing Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 80 (1998)).  For example, offhand comments, isolated incidents (unless extremely serious), and other similar tribulations of the workplace will not amount to changes altering the terms and conditions of employment.  See Faragher, 524 U.S. at 788.

Furthermore, to be actionable under the statute, the work environment must be offensive on both an objective and a subjective level.  Id. at 787.  That is, the environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  Id.  This is a question to be determined with regard to the totality of the circumstances.  See Henson, 682 F.2d

24

at 904.  Additional factors for courts to consider in the totality analysis include: the frequency of the discriminatory conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with an employee's work performance.  See Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993).

It is undisputed that Herring belongs to a protected group, African-American, and that the alleged harassment was unwelcome.  Con-Way argues, however, that Herring cannot establish that the alleged harassment was on the basis of his race, or that the conduct was sufficiently severe or pervasive to alter the terms and conditions of his employment and create a discriminatorily abusive work environment.  Even if Herring can so establish, Con-Way argues that it is not liable under the Faragher/Ellerth defense.  The court discusses each contention in turn.

### 1. On the Basis of Race

Con-Way contends that Herring failed to establish that the alleged harassment he endured was because of his race because he "never experienced any derogatory statements because of his race, and there is no evidence that he ever experienced any adverse treatment because of or concerning his race."  (Def. Br. at 21.)  Herring, on the other hand, highlights evidence that his performance was

25

comparable to that of white supervisors, but that he was disciplined more often for "petty" or "ridiculous" reasons.

Whether Herring established this factor is a close call. While it is true that Herring never personally experienced any derogatory statements because of his race, Herring testified that the overall culture was derogatory toward African Americans and gave two specific examples: (1) the racially derogatory joke about African American drivers and (2) Bowen's statement that the driver who used the word "nigger" was too harshly punished. In addition, Herring presented evidence of a white comparator, Ryan Beagle, whom Herring contends was disciplined differently by Bowen. Herring argues that the issues for which Bowen gave LOIs to Herring occurred to other supervisors as well, but, according to the files of the other FOSs, Bowen never gave them an LOI for such infractions.[29] Instead, for the majority of the LOIs issued to these white supervisors, Bowen would wait to be instructed by the Quality Control Department to issue an LOI; the LOI would not come directly from Bowen. In addition, Herring testified that his LOIs contained

---

[29] Herring gives the following example:
> The one time Herring was late for work, Bowen issued Herring a LOI . . . which catalogued each and every instance of earlier written discipline. However, Ryan Beagle admits that there were times he was late for work and Bowen did not issue him any written discipline.

(Pl. Opp. Br. at 9-10) (citations omitted).

an explicit laundry-list of every previous LOI, as compared to the LOIs of white supervisors which were incomplete or inaccurate.[30]  Because of the standard at summary judgment and the inferences the court must take in favor of the plaintiff, the court assumes that Herring established, at this stage only, that the harassment was because of his race.

## 2. Severe or Pervasive

Assuming that the alleged harassment was because of his race, Herring must also  establish that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment.  As stated above, establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component.  Mendoza, 195 F.3d at 1246 (citation omitted).  The employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable.  Id. The "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' "

---

[30] For example, some of the LOIs issued to Beagle stated "none" in the list of previous discipline, when this statement was clearly inaccurate.

27

<u>Oncale</u>, 523 U.S. at 81 (quoting <u>Harris</u>, 510 U.S. at 23).  This objective component is necessarily fact-intensive, and the court considers these four  factors: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; (4) and whether it unreasonably interferes with an employee's work performance.  <u>Allen v. Tyson Foods</u>, 121 F.3d 642, 647 (11th Cir. 1997) ; <u>see also Edwards v. Wallace Cmty. Coll.</u>, 49 F.3d 1517, 1521-22 (11th Cir. 1995).

There is no dispute that Herring subjectively perceived that he was being harassed on the basis of his race.  His testimony clearly evidences such subjective perception, as well as his journal that he kept throughout the end of his employment at Con-Way.  However, from an objective standpoint, Herring's allegations fall short of establishing that Herring's subjective perception was objectively reasonable.

According to Herring's testimony, the alleged conduct occurred on a somewhat frequent basis.  Herring contends that Bowen "constantly" yelled at him over the radio and belittled him in front of his peers and subordinates.  Herring testified that Bowen threatened Herring's job stability and attempted to break Herring's spirit by issuing LOIs for "petty" or "ridiculous" reasons, although Herring could not recall whether those reasons were valid or not.  Herring felt that

28

Bowen was trying to make Herring lose his temper and quit his job.  In addition, according to Herring, Bowen issued him an inordinate amount of discipline, especially compared to the white supervisors, over a short period of time, for incidents that he normally did not discipline the white supervisors.

The alleged conduct, however, is not particularly severe.  Although Herring contends that Bowen issued allegedly "petty" or "ridiculous" LOIs, Herring never disputed the veracity of those incidents at the issuance of the LOI, and could not recall at his deposition whether certain incidents occurred.  Instead, Herring admitted that he was not perfect and definitely made mistakes on the job.  Not one time in his deposition did Herring dispute that an alleged infraction did not occur.  Moreover, although Herring felt belittled by Bowen's yelling, which sometimes included profanity, Herring did not produce evidence that Bowen's alleged yelling was particularly severe - especially compared to the cases in the Eleventh Circuit finding severe or pervasive racial harassment.  It certainly was not physically threatening or particularly humiliating.  That some of his subordinates heard Bowen's alleged tirades does not change this analysis.

The court does, however, consider the incident where Herring was made to pick up trash somewhat humiliating. In addition, although Herring never personally experienced any racial epithets, in the totality of the circumstances

29

analysis, the court is aware that Herring considered one joke told by a peer to be racially derogatory and knew of an incident when a driver used the word "nigger" and Bowen believed his punishment to be too harsh.  The court also considers Herring's testimony that he believed that Bowen's alleged harassment, including the assignment of more difficult and time-consuming tasks (with or without his allocated number of drivers), made it more difficult for Herring to do his job.[31]

However, under the totality of the circumstances and looking at the binding precedent in the Eleventh Circuit, the court concludes that the alleged harassment was not severe or pervasive.  Despite the fact that Herring has the frequency of the yelling and screaming on his side and the frequency of LOIs (for valid violations of policy), Herring has not presented evidence that the conduct amounted to anything more than the tribulations of dealing with a demanding boss.  And even constant scrutiny in combination with offhand comments is not sufficient for a finding that plaintiff's working conditions were altered or that plaintiff was subject to severe conduct.  See Hill v. IGA Food Depot, 2006 WL 3147672, No. 2:04-cv-00966, at *4 (M.D. Ala. Nov. 2, 2006), citing Dudley v. Wal-Mart Stores, Inc., 931 F.Supp. 773, 816 (M.D. Ala. 1996), abrogated on other grounds by

---

[31] The court notes, however, that Herring also testified that most nights he was able to complete his work, even on the nights when a driver was taken away from his sector.

Moore v. State of Alabama, 989 F.Supp. 1412 (M.D. Ala. 1997) (Plaintiff's claim that her supervisor "scrutinized her work and pointed out her shortcomings on a regular basis . . . does not approximate the severity required to state a claim for a hostile work environment). Thus, defendant's motion for summary judgment as it relates to Herring's claim of racial harassment is due to be granted. The court, however, continues the analysis in the alternative.

### 3.  Faragher/Ellerth Defense

Where no adverse employment decision has resulted from the harassment, the Faragher court allows the employer an affirmative defense. See Pennsylvania State Police v. Suders, 542 U.S. 129, 148 (2004). The affirmative defense requires the employer to satisfy two elements to successfully interpose this defense: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807. As to the first prong, the Court in Faragher "implied that employers could meet the initial burden in determining whether they had exercised reasonable care to prevent sexual harassment by promulgating an anti-harassment policy." Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1297-98 (11th Cir. 2000). In fact,

"dissemination of an employer's anti-harassment policy [is] fundamental to meeting the requirement for exercising reasonable care in preventing sexual harassment." Id. at 1298.  In addition to promulgating an anti-harassment policy, an employer must also ensure that the policy itself adequately addresses Title VII's deterrent purpose. At a minimum, employers must "establish a complaint procedure 'designed to encourage victims of harassment to come forward [without requiring] a victim to complain first to the offending supervisor.' " Id. (quoting Faragher, 524 U.S. at 806 (alteration in original) (citations omitted)).

Even if Herring established that the alleged harassment was because of his race and sufficiently severe or pervasive, Con-Way is not liable for the alleged harassment under the Faragher/Ellerth defense.[32]   First, Con-Way had valid anti-discrimination and anti-harassment policies,[33] upon which Herring had been trained.  The policies adequately "establish[ed] a complaint procedure 'designed to encourage victims of harassment to come forward [without requiring] a victim to

---

[32] The court is unpersuaded by Herring's argument that the defense is unavailable. Although it is true that the defense is unavailable with regard to tangible employment action claims, Herring has not argued, nor pled, a tangible employment action case.  Instead, Herring has argued, from the very beginning, his claim as a hostile work environment claim.  Moreover, the mere fact that Herring was terminated does not somehow convert his hostile work environment claim into a tangible employment action claim.

[33] Although plaintiff's brief insinuates that Con-Way's policies were ineffective or incomplete, Herring made no argument regarding this insinuation, nor produced any evidence to contradict the policies in the record or to show that it was not adequately disseminated.

complain first to the offending supervisor.' " <u>Madray</u>, 208 F.3d at 1298 (citations

omitted).  Second, there is absolutely no evidence in the record from which a

reasonable juror could conclude that Herring ever made a complaint of race

discrimination or racial harassment to any of his supervisors, or any of the other

individuals authorized to take such complaints.[34]  Any complaints to his peer

supervisors do not constitute a reasonable effort to take advantage of Con-Way's

reporting procedures, specifically delineated in its discrimination and harassment

policies.  <u>See Walton v. Johnson & Johnson Servs., Inc.</u>, 347 F.3d 1272, 1289 n.15

(11th Cir. 2003); <u>Madray</u>, 208 F.3d at 1302 (holding that amorphous complaints to

persons not authorized to accept complaints does not constitute a reasonable effort

to take advantage of employer's complaint procedures).

Finally, Herring's subjective fears of reprisal do not excuse his failure to

report the alleged harassment.  <u>See Caridad v. Metro-North Commuter R.R.</u>, 191

F.3d 283, 295 (2d Cir. 1999) (concluding that plaintiff's failure to report

harassment for several months was not based on a "credible fear" that her

complaint would fall on deaf ears or that she would suffer an adverse employment

action as a result of her decision to file a complaint); <u>Shaw v. AutoZone, Inc.</u>, 180

F.3d 806, 813 (7th Cir. 1999) (holding that plaintiff's subjective fear that she

---

[34] For a thorough examination of Herring's complaints, see Section IV.C.1.a, <u>infra</u>.

would suffer retaliation for filing a complaint not sufficient to excuse delay in reporting incidents of harassment). Subjective fears of reprisal may exist in every case, but, those fears, standing alone, do not excuse an employee's failure to report a supervisor's harassment. See Walton, 347 F.3d at 1290-91. Here, although Herring subjectively felt like they were trying to make him resign, Herring was never specifically told that his job was in jeopardy, nor was he threatened with physical harm. The court, therefore, concludes that Herring did not reasonably avail himself of the protections afforded by Con-Way's anti-harassment policies. As such, Con-Way may take advantage of the Faragher-Ellerth defense and summary judgment is due to be granted on Herring's claim of racial harassment.

## B. Discrimination on the Basis of Race[35]

Absent direct evidence of discrimination,[36] a plaintiff may establish a prima facie case of discrimination in termination through circumstantial evidence by proving that  a plaintiff in a termination case establishes a prima facie case by showing (1) that he is a member of a protected class; (2) he was qualified for the

---

[35] The elements of a claim of race discrimination under § 1981 are the same as a Title VII disparate treatment claim in the employment context. Rice-Lamar v. City of Ft. Lauderdale, Fla., 232 F.3d 836, 843 n.11 (11th Cir. 2000) (citing Peterson v. BMI Refractories, 132 F.3d 1405, 1412 n.13 (11th Cir. 1998)). As such, these claims are addressed collectively under the rubric of Title VII caselaw.

[36] It is undisputed that there is no direct evidence of discrimination.

position held; (3) he was terminated, and (4) that he was replaced by a person

outside the protected class.[37]  Coutu v. Martin County Bd. of Comm'rs, 47 F.3d

1068, 1073 (11th Cir. 1995).  After the plaintiff has shown a prima facie case and,

thereby, has raised the presumption of discrimination, the burden of production

shifts to the employer to articulate a legitimate, nondiscriminatory reason for its

actions.  Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002); Combs v.

Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997).  A subjective reason is

a legally sufficient, legitimate, nondiscriminatory reason if the defendant

articulates a clear and reasonably specific factual basis upon which the employer

based its subjective opinion.  Chapman v. AI Transport, 229 F.3d 1012, 1032

---

[37] Both parties confuse the elements of the prima facie case, although the court admits that the Eleventh Circuit often does the same thing.  In a termination case like the one here, the plaintiff does not have to establish the existence of similarly situated comparators.  "A prima facie case of discrimination in termination is established where the plaintiff proves by a preponderance of the evidence that he or she is a member of a protected class, was qualified for the position held, and was discharged and replaced by a person outside of the protected class or was discharged while a person outside of the class with equal or lesser qualifications was retained."  Walker v. Mortham, 158 F.3d 1177, 1187 n.21 (11th Cir. 1998) (emphasis in original) (citing Lee v. Russell County Bd. of Educ., 684 F.2d 769, 773 (11th Cir.1982)).  The disjunctive nature of the prima facie standard has been overlooked by many courts for whatever reason and has caused much confusion in the precedent.  See Walker, 158 F.3d at 1187 n.21.  However, the earliest cases which articulate the prima facie elements in termination cases do not support an element of relative qualifications if the employer has filled the plaintiff's position with a person outside the plaintiff's protected class.  See Lee, 684 F.2d at 773; Jackson v. City of Killeen, 654 F.2d 1181, 1183-84 & n.3 (5th Cir. 1981); Rhode v. K.O. Steel Castings, Inc., 649 F.2d 317, 322 (5th Cir. 1981).  Because the court is bound to follow the "earliest case rule," see Walker, 158 F.3d at 1188-89, the court does not require the plaintiff to establish the similarly situated element in this termination case.

(11th Cir. 2000).  If the employer satisfies that burden by articulating one or more

such reasons, then the presumption of discrimination falls and the burden of

production again shifts to the plaintiff to offer evidence sufficient for a reasonable

jury to conclude that the employer's supposedly legitimate reason is merely a

pretext for illegal discrimination.[38]  Id. at 1024-25.  Although the prima facie case

is irrelevant once the employer has offered a legitimate reason for its actions, the

evidence of pretext may include the same evidence offered to establish the prima

facie case.  See Combs, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and

the defendant, "[t]he ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with

the plaintiff."  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Given that the ultimate burden of persuasion always lies with the employee, a

plaintiff may prevail on an employment discrimination claim and may also defeat a

summary judgement either by proving that intentional discrimination did indeed

motivate the defendant or by producing sufficient evidence to allow a rational trier

of fact to disbelieve the employer's proffered legitimate reasons, thus permitting

---

[38] If the proffered reason is one that might motivate a reasonable employer, a plaintiff
cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that
reason is not sufficient.  Chapman, 229 F.3d at 1030.

36

but not compelling the trier of fact to make a finding of illegal discrimination.  <u>See</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 147-48 (2000); <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502 (1993); <u>Abel v. Dubberly</u>, 210 F.3d 1334, 1339 (11th Cir. 2000); <u>Alexander v. Fulton County</u>, 207 F.3d 1303, 1336 (11th Cir. 2000); <u>Combs</u>, 106 F.3d at 1529-38 (interpreting <u>Hicks</u> and the post-<u>Hicks</u> case law)).

### 1.  <u>Prima Facie Case</u>

It is undisputed that Herring is a member of a protected class and that he suffered an adverse employment action when he was terminated.  (See Def. BR. at 25.)  The evidence is also clear that Herring was replaced by a person outside his protected class.  Con-Way contends, however, that Herring failed to establish that he was qualified for the position.

Con-Way argues that Herring was not qualified for the FOS position because of his continual unsatisfactory performance in that position.  (Def. Br. at 25-27.)  Con-Way highlights Herring's failure to improve despite numerous counselings over an extended period of time and Herring's lack of denial of the commission of the infractions which led to the corrective actions taken against him, including his termination.  (<u>Id.</u>)  In sum, Con-Way argues that because "Con-Way was not satisfied with plaintiff's performance," Herring "cannot satisfy the

qualification element."  (Id. at 26) (citing Baker v. Sears, Roebuck & Co., 903 F.2d 1515, 1520 (11th Cir. 1990).

The court disagrees with Con-Way.  Con-Way's dissatisfaction with Herring's performance does not equate with a conclusion that Herring was not qualified for the position, thus preventing him from establishing a prima facie case.  The burden shifting scheme articulated in McDonnell Douglas is designed to "bring the litigants and the court expeditiously and fairly to the ultimate question [of discrimination]," and the prima facie requirement "is not an onerous one."  Burdine, 450 U.S. at 253 (1981).  The Eleventh Circuit has repeatedly recognized that in termination cases, the question of whether the plaintiff was qualified to do the job is not often at issue.  See Crapp v. City of Miami Beach, 242 F.3d 1017, 1020 (11th Cir. 2001).  Generally, "allegations of poor performance against plaintiffs discharged from long-held positions may be properly considered . . . when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination."  Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1360 (11th Cir. 1999).   In fact, "in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can

38

be inferred."  Rosenfield v. Wellington Leisure Products, Inc., 827 F.2d 1493,

1495 n.2 (11th Cir. 1987).

   While Herring did not hold the FOS position for an extremely long time, he

was in that position for a little less than a year and a half.  Because the court is

ever-mindful that the prima facie requirement "is not an onerous one," Burdine,

450 U.S. at 253 (1981), the court assumes that the time Herring spent as an FOS is

significant enough to establish that Herring was qualified for the position, insofar

as the prima facie case is concerned.  This conclusion is bolstered by the fact that

Herring was in a supervisory role as an FOS and he was never demoted or even

threatened with demotion because of his performance.  Con-Way's arguments

regarding Herring's performance and Con-Way's dissatisfaction with his

performance are more properly considered at the pretext stage.

   In addition, Baker v. Sears, Roebuck & Co., the case cited by Con-Way in

support of its argument, is distinguishable.  In Baker, the plaintiff failed to meet

the company's quota for the sale of maintenance agreements.  903 F.2d at 1520.

This failure occurred over an extended period of time and ultimately resulted in

the plaintiff's being transferred to a lower-paying position.  Id.  The Eleventh

Circuit agreed with the district court[39] that "the plaintiff failed to prove that she was qualified for the employment position at issue." Id. at 1516. However, the failure to meet sales quotas over an extended period of time is markedly different than the performance problems which led to Herring's termination. As such, Baker does not control, and the court concludes that, for the purposes of the prima facie case, Herring has established that he was qualified for the FOS position. Therefore, Herring established a prima facie case of discrimination in his termination.

2. Legitimate Nondiscriminatory Reason and Pretext

Because Herring established a prima facie case of discrimination, Con-Way must articulate a legitimate, nondiscriminatory reason for his termination. See Rojas, 285 F.3d at 1342. Con-Way states that it terminated Herring because of poor performance, thus satisfying its burden. The presumption of discrimination, established by the prima facie case, now falls and the burden of production again shifts to Herring to offer evidence sufficient for a reasonable jury to conclude that

---

[39] The court notes that the citations by Con-Way to Baker are a bit deceptive. The Eleventh Circuit opinion states, in its entirety, as follows:

> The district court granted summary judgment in this age discrimination case because the plaintiff, the appellant here, failed to establish a prima facie case. Specifically, the plaintiff failed to prove that she was qualified for the employment position at issue. We AFFIRM the district court's judgment for the reasons stated in its dispositive order, which appears in the appendix.

Con-Way's legitimate reason for his termination is merely a pretext for illegal race

discrimination.  Chapman, 229 F.3d at 1032.

Herring makes six pretext arguments[40] in his brief in opposition to summary

judgment.  The arguments are, in full,[41] as follows:

> First, Herring and four declarants testified that Herring's job
> performance was superior or equal to that of the Caucasian
> supervisors who were not terminated.  Second, Herring and four
> declarants testified that Freight Operations Manager John Bowen
> regularly harassed Herring – including yelling and cursing at him in
> front of both the other supervisors and the hourly employees – in
> contrast to his treatment of the Caucasian supervisors, even when the
> same issues occurred in the performance of their jobs.  Third, . . .
> Herring was disciplined for issues which [allegedly] occurred
> regularly in the Caucasian supervisors' sectors but for which no
> discipline was apparently issued.  Fourth, Herring testified that on the
> night of the alleged poor performance which led to Service Center
> Manager Tim Grant's recommendation that Herring be terminated, he
> was operating without a Data Entry Clerk and without sufficient labor
> to manage the sector and that when other supervisors' section shut
> down late they were not terminated.  Fifth, the stark contrast between
> Herring's testimony about his termination meeting and Grant's
> version of that meeting would allow a jury to infer that the defendant

---

[40] The court generously characterizes plaintiff's statements regarding pretext as "arguments."  As seen by the court's complete recitation of these "arguments," plaintiff simply lists six separate reasons why the court should find that Herring established that Con-Way's legitimate, nondiscriminatory reason for his termination is a pretext for discrimination.  One sentence can scarcely be characterized as adequate argument.

[41] The plaintiff also "incorporates" all the evidence presented in his facts section as part of his pretext argument.  Such "argument" is rejected by the court.  The court is not required to sift through the facts and determine what is and is not part of plaintiff's pretext argument.  It is the plaintiff who is required to present and argue such facts to the court.  The court refuses to make plaintiff's arguments for him.

was not being truthful and that the real reason he was terminated was
intentional discrimination. Finally, contrary to the defendant's
representations to the EEOC and to the plaintiff earlier in this case,
the plaintiff was replaced by a Caucasian who was immediately
promoted into the position rather than by an African-American
supervisor hired several months after the plaintiff filed his EEOC
charge.

(Pl. Opp. Br. at 35-36.)

Plaintiff's first and third arguments run together.  The argument is

essentially that Herring performed as well, or better, than other white supervisors

who were not terminated, and that the LOIs which led to his termination were

issued for reasons that white supervisors were not given discipline.  The evidence,

however, does not support this proposition.  Herring's self-serving testimony and

that of the declarants does not change the undisputed fact that Herring had an

exorbitant number of LOIs as compared to the other supervisors.  Nowhere in

Herring's testimony could he recall an instance where an LOI was not issued for a

legitimate violation of policy - even when he examined them one by one and was

given an opportunity to discuss each LOI individually in his deposition.

Herring's testimony that Bowen found "petty" or "ridiculous" reasons to

issue him discipline does not negate this conclusion.  Herring only provided one

concrete example where a white FOS was not disciplined for a reason Herring was

disciplined: being late on one occasion.  This one example is simply insufficient as

42

it does not even touch at the nondiscriminatory reason for his termination: poor performance.  In essence, these arguments boil down to Herring disagreement with the reason for his termination.  The Eleventh Circuit has repeatedly stated that such arguments fail to establish pretext.  See Alexander, 207 F.3d at 1339 ("We have explained, a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where the reason is one that might motivate a reasonable employer.")

The second reason, Bowen's general demeanor towards plaintiff, including "yelling and cursing" do not establish that Herring was terminated because of his race.  They do establish that Bowen and Herring had a poor working relationship and that Bowen might not have been the best guy to work for.  However, Herring has pointed the court to no case law which allows the mere fact that a white supervisor yelled and cursed at a black employee establish pretext.  The court is unwilling to do so here.

The fourth and fifth arguments also amount to nothing more than quarreling with the reason stated for his termination.  That Herring's sector was understaffed on the night of his termination and that Grant and Herring have different recollections about the events surrounding his termination meeting in no way establish pretext.  The failure to properly close his sector that final night was the

43

straw that broke the camel's back.  It was not the only reason for his termination; it was the culmination of a pattern of poor performance by Herring.  Herring's attempt to excuse this failure is misplaced in a pretext argument.  See id.  In addition, the court is at a loss to understand how the differences between Herring's and Grant's testimony regarding his termination meeting allow a jury to disbelieve the stated reason for Herring's termination.  Herring's failure to specify which differences in their testimonies befuddles the court, and the court will not concoct an argument for the plaintiff.  The court has already given too many liberties to plaintiff's "arguments" and poor citation to the record.

Plaintiff's last argument is also meritless.  The representations made by defendant to the EEOC and plaintiff about plaintiff's replacement are not part of the record evidence before the court, and thus, cannot even be considered by the court in its determination.  Moreover, the mere fact that plaintiff was replaced by a white individual, without more, does not establish pretext.

Therefore, taken individually and considered as a whole, Herring has failed to produce evidence sufficient for a juror to conclude that Con-Way intentionally discriminated against Herring because of his race in his termination.  Summary judgment is due to be granted in favor of Con-Way on Herring's claim of discrimination in termination.

44

## C.  Retaliation

Both Title VII and § 1981 prohibit an employer from retaliating against an employee for enforcing his rights under each Act.  Title VII specifically states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  In addition, since the 1991 amendments, § 1981 has been specifically interpreted to cover race-based retaliation in all phases of contractual relations.  42 U.S.C. § 1981(b); Andrews v. Lakeshore Rehab. Hosp., 140 F.3d 1405, 1411 (11th Cir. 1998).  Retaliation is a separate claim under both Title VII and § 1981, and to recover under such a claim, a plaintiff "'need not prove the underlying claim of discrimination which led to her protest,' so long as she had a reasonable good faith that the discrimination existed."  Gupta, 212 F.3d at 586 (11th Cir. 2000) (citing Meeks v. Computer Assocs. Int'l., 15 F.3d 1013, 1021 (11th Cir. 1994)).  Thus even where a plaintiff has failed to make a prima facie showing of discrimination (or present sufficient evidence of discriminatory treatment), he may still have a valid claim for retaliation.

45

To establish a prima facie case of retaliation, a plaintiff must prove the following elements: (1) he participated in a protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision. <u>See</u> <u>Farley v. Nationwide Mut. Ins.</u>, 197 F.3d 1322, 1336 (11th Cir. 1999). Just as with a discrimination claim, once the plaintiff has made a prima facie case of retaliation, the defendant must come forward with a legitimate, non-retaliatory reason for the adverse employment decision. <u>See Hicks</u>, 509 U.S. at 507. Because a plaintiff bears the burden of proving pretext, after defendant has articulated a legitimate, non-retaliatory reason for the termination, plaintiff must present significantly probative evidence proving pretext to avoid summary judgment. <u>See</u> <u>Celotex</u>, 477 U.S. at 317. That is, the plaintiff must establish evidence from which a reasonable trier of fact would disbelieve rather than disagree with defendant's articulated legitimate, non-retaliatory reason for the adverse employment action. <u>See</u> <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1543 (11th Cir. 1997).

## 1. <u>Prima Facie Case</u>

It is undisputed that Herring suffered an adverse employment action when he was terminated. Con-Way argues, however, that Herring cannot establish the

remaining two elements of his prima facie case: that he engaged in protected

activity or a causal connection between any protected activity and his termination.

### a. Statutorily Protected Activity

Title VII's retaliation provisions protect only certain kinds of activity.

Under the opposition clause, an employer may not retaliate against an employee

because the employee "has opposed any practice made an unlawful employment

practice by this subchapter." 42 U.S.C. § 2000e-3 (a).  And, under the

participation clause, an employer may not retaliate against an employee because

the employee "has made a charge, testified, assisted, or participated in any manner

in an investigation, proceeding, or hearing under this subchapter."  Id.  Herring

argues that he engaged in protected activity under the opposition clause when he

allegedly made complaints to his supervisor about the alleged harassment.  (Pl.

Opp. Br. at 32.)  The court disagrees.

There is nothing in the record, other than mere argument or speculation, to

support Herring's contention that he engaged in activity protected by Title VII or

§1981.  First, the record is devoid of any written evidence of a complaint made by

Herring, or on behalf of Herring, before his termination.  Second, it is undisputed

that Herring did not use the methods established by Con-Way to report

discrimination or harassment.  Herring testified that although he knew about the

Open Door Policy,[42] he never took advantage of the reporting procedures.

(Herring Dep. at 183, 190-92, 196, 294-95.)  It is axiomatic that Herring must

participate in protected activity to be retaliated against for that protected activity.

Herring, however, argues in his brief that he engaged in protected activity

"when he complained to John Bowen that the LOIs he generated were without any

basis in fact" and "when he complained to Tim Grant that Bowen was unfairly

harassing him and issuing baseless discipline. " (Pl. Opp. Br. at 32.)   This

argument is misleading at best, and untruthful at worst.  The evidence cited by

plaintiff in support of these two alleged complaints does not support these

statements.  Instead, the evidence reveals that plaintiff made general complaints of

mistreatment to his supervisors.  There is absolutely no evidence in the record that

Herring ever stated that the mistreatment was because of his race:

> Q:   Have you ever made any complaints of discrimination,
>       harassment, or retaliation to Mr. Grant?
> A:   Yes.
> Q:   When?
> A:   When he first came to the service center.  I remember telling
>       him I didn't feel like I should have received all the write-ups,
>       and that they were a form of harassment, a form of sticking it to
>       me.
> Q:   Did you say you felt like you were receiving them because you
>       were black?

---

[42] It is undisputed that Herring received copies of all the relevant policies as there is a signed acknowledgment form of such receipt.  (Herring Dep. at 190-92.)

A:      I'm not sure if I used those exact words.

Q:      What words are you sure that you used?

A:      I'm not sure of the exact conversation, but I do remember speaking with Mr. Grant about the unfair treatment that I had upon him coming to the location, with the aspiration that things would be different.

(Herring Dep. at 180-81.)

Q:      Did you tell Tim Grant that you were being discriminated against, harassed, because of your race, and that you were being retaliated against?

A:      I told him about the unfair write-ups.

Q:      I understand you said that things just weren't fair.  Did you say, "Things aren't fair because I'm black?"  Did you say, "They're getting on me because I'm black; they're retaliating against me"?

                                    . . .

Q:      Did you ever say, "All of this is happening to me because I am black"?

                                    . . .

A:      I'm not sure.

(Id. at 217.)

Q:      Did you ever tell Mr. Bowen, Mr. Grant, and Ms. Clinton [plaintiff's former supervisor in Texas] specifically "I am being subjected to harassment in a hostile work environment because of my race"?

A:      I told them I had been subjected to mistreatment, which implies a hostile work environment.  That's what I said, "mistreatment," to say a hostile work environment, yes.

Q:      So you told them "mistreatment, but you believe mistreatment to constitute a hostile work environment?

A:      Yes.

Q:      Did you tell them that you were suffering mistreatment because of your race?

49

> A:     I'm not sure.
>                        . . .
> Q:     Do you know if you ever said anything about your race to these
>        individuals?
> A:     I don't know.

(Id. at 372-73.)

These general complaints by Herring are insufficient to put his supervisors on notice that he was complaining about race discrimination, retaliation or harassment.  Herring's testimony regarding his complaints amount to nothing more than complaints that some of his write-ups were "unfair" or that he was being mistreated by his supervisor.  Title VII and § 1981, however, are not a general civility codes and do not protect employees from being mistreated in the workplace.  In sum, these complaints to not constitute protected activity under Title VII because Herring was not "oppos[ing] any practice made an unlawful employment practice by this subchapter," 42 U.S.C. § 2000e-3 (a), nor do they amount to a complaint about race discrimination, retaliation, or harassment.  See § 1981.

Herring did testify, however, that he complained to his co-workers or "peer supervisors" that he was being treated unfairly because of his race.  (Herring Dep. at 193, 219.)  Title VII protects "individuals who have filed formal complaints," those "who informally voice complaints to their superiors or who use their

employers' internal grievance procedures." Rollins v. Fla. Dep't of Law

Enforcement, 868 F.2d 397, 400 (11th Cir. 1989) (emphasis added); Shannon v.

Bellsouth Telecomms., Inc., 292 F.3d 712, 716 n.2 (11th Cir. 2002).  Herring's

complaints to his co-workers do not amount to protected activity under Title VII

or § 1981.  As such, Herring failed to establish the first element of his prima facie

case of retaliation and summary judgment is due to be granted on this claim.

### b.  Causal Connection

Additionally, even if the activity engaged in by Herring was protected

activity, Herring did not establish a causal connection between the protected

activity and the adverse employment action.  To establish a causal connection, a

plaintiff must show that the decision-maker was aware of the protected conduct

and that the protected activity and the adverse action were not wholly unrelated.

See id. at 1377.  The causal link element is generally construed broadly so that "a

plaintiff merely has to prove that the protected activity and the negative

employment action are not completely unrelated." Olmstead v. Taco Bell Corp.,

141 F.3d 1457, 1460 (11th Cir. 1998).  Thus, a "close temporal proximity" between

the plaintiff's protected conduct and an adverse employment action generally is

sufficient circumstantial evidence of a causal connection for purposes of a prima

facie case.  See id.  On the other hand, the Eleventh Circuit has indicated that a

substantial delay between the protected activity and the adverse employment action and the absence of other evidence tending to show causation may justify judgment as a matter of law for the employer.  See <u>Wascura v. City of South Miami</u>, 257 F.3d 1238, 1248 (11th Cir. 2001); see also <u>Maniccia v. Brown</u>, 171 F.3d 1364, 1370 (11th Cir. 1999).  Moreover, the Supreme Court has warned that "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action . . . must be 'very close.'" <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001) (citations omitted).

Even assuming that Herring's informal complaints amount to protected activity, there is absolutely no evidence in the record to establish a causal connection between Herring's complaints and his termination.  The record is silent as to when his alleged complaints were made.  The court has scoured the record and cannot discern when Herring contends he made his complaints to his supervisors.  Herring's brief is of no help in this regard.  Instead, it contains one sentence regarding causal connection: "Finally, there is a causal connection between Herring's complaints and each tangible employment action since the LOIs continued and those LOIs were a significant factor in the decision to terminate his employment."  (Pl. Opp. Br. at 32-33.)  Without any idea as to when Herring complained to his supervisors it is impossible for the court to adequately

52

determine whether he was retaliated against in his termination for making those complaints.  As such, Herring has failed to establish a causal connection between any protected activity and his termination, and summary judgment is due to be granted as to his claim of retaliation.

2.   <u>Legitimate, Non-Retaliatory Reason and Pretext</u>

Out of an abundance of caution, the court continues it analysis in the alternative.  Even assuming that Herring established a prima facie case, he failed to establish that Con-Way's legitimate, nonretaliatory reason for his termination was a pretext for illegal retaliation.  Although Herring does not include any argument in his brief regarding this issue, the court assumes that he incorporates his pretext arguments regarding illegal discrimination as also establishing pretext as to the legitimate, nonretaliatory reason for his termination.  (See Pl. Opp. Br. at 33-36.)  These arguments fail for the same reasons stated in Section IV.B.2, <u>supra</u>. As such, summary judgment is due to be granted on Herring's claim of retaliation.

53

## V.  Conclusion

In summary, the court finds that no material issues of fact remain and that defendant Con-Way Freight Inc. is entitled to judgment as a matter of law as to all claims asserted by plaintiff.

A separate order will be entered.

**DONE** this the __14th__ day of May, 2008.

_____

SENIOR UNITED STATES DISTRICT JUDGE